MARIE A. K. WARD, Respondent, *v.* F. R. A. OPERATING CORPORATION, Appellant.

(Argued October 17, 1934; decided October 23, 1934.)

*James A. Nooney* and *Ralph O. L. Fay* for appellant.

*Harold R. Medina* and *William F. Mc Nulty* for respondent.

CRANE, J. On Labor Day night, September, 1932, Mrs. Marie A. K. Ward attended a moving picture performance at the Farragut Theatre on the corner of Flatbush avenue and Farragut road, Brooklyn, N. Y. She

was seated on the right-hand side of the middle aisle in about the seventh or eighth row from the front, and the third seat in. The place was filled and all the seats were taken. She had not been there very long when in front of her and a little to the side near the stage, an explosion took place, causing " a panic and great confusion, and the crowd of course screamed and the theatre appeared to be on fire." The explosion was caused by a sulphur bomb, giving out flame and smoke and a stench. Apparently it was set off by some one belonging to, or in sympathy with a labor organization, hostile to the proprietor of this moving picture house.

In a fight between two local labor organizations there had been previous trouble, and pickets were walking up and down in front of the theatre. The managers had applied to the police for protection. The explosion, therefore, was the deliberate, wicked act of a person over whom the defendant had absolutely no control and of whose hostile presence it was unaware. Some of the people were panic-stricken and rushed up the front aisle to the back of the house, and to the left-hand doors in an attempt to get out. The theatre was in darkness as the picture was being shown upon the screen. When the bomb went off, Mrs. Ward stood up in her seat, which was a folding seat, and some unknown man on the right-hand side toward the front jumped over the seats, going toward the front door, the main door, put his hand on her shoulder as leverage to jump over the back of the seat that she was sitting on, throwing Mrs. Ward over the arm of the chair, causing her injuries. She says that it seemed as if he was jumping over several seats before he reached her as he was beyond the row in front. " Q. Have you any idea whatsoever how long you had been standing before this happened? A. No, I have not; it was longer than a second or two. Q. But you don't know how much longer, do you?. A. No." Mrs. Ward further says: " I had been standing there and allowing

people to pass me rather than to get into the crowd; I was standing against the back of the seat."

A Mr. Daly, who was sitting in the fifteenth or twentieth row back from the screen, says that while the lights were off and the picture was being shown, this explosion of sulphur took place down near the front rows and he stood up to see what was going to happen. " I stood up in my seat straight, because people were jumping up all around me hollering. I lost my hat and I stood up straight into the seat and stayed there to find out which way I was going to get out myself; they were going toward all doors. I stayed on there even after the explosion to see the balance of the picture. Everybody seemed to rise up at once when it happened."

" Q. And did they start to move, to leave their seats, immediately after the explosion? A. That is right. By the Court: Q. Were there cries or shouts in the audience? A. Yes, there were. Everybody — I say everybody — most of the people, some of the people held their head, others lost their heads. That is where the trouble started."

Deshia Brown, another spectator, was in the front row when the explosion occurred. " Q. What kind of an explosion was it? A. Well, it had an awful odor, and it seemed like a flame, and it bursted up, and then it went into a smoke, and it was like a stench. Q. And when that happened what did the people in the theatre do? A. Well, in the section where I sat there was screams from the people that were burned. Q. And what did they do, apart from being burned? A. And there seemed to be a mad rush toward the front of the theatre."

Lafayette C. Hobart, another spectator, gave this testimony: " Q. And at the time this explosion took place, what did the people in the theatre do — I mean the audience, the spectators? A. Well, I grabbed my wife and I went toward the front of the house; my wife was with me; my clothes were burned, and my shoulder and neck and hair and everything else was burned. Q. You went

through the aisle without any difficulty, didn't you? A. Oh, no; there was a lot of people in the aisle, people standing in the aisle, firemen and everybody else. The firemen stood right alongside of me; two of them in uniform."

A Mr. Gottberg, also in the theatre, had this to say: " Q. What happened when the explosion took place? Was there smoke, and were there fumes and a bad smell? A. Yes. Q. What did the people in the theatre do? A. Started for the exits. Q. And how did they start? A. Moderately, moderately rushing."

This is a full and complete description from the testimony, most favorable to the plaintiff, as to what took place at the time of the explosion. The plaintiff has built up this action for negligence against the owners of the theatre solely upon this additional testimony, contradicted by the defendant, and yet which we must accept as true in view of the findings; — as the picture was being shown at the time of the explosion or the flare-up of the sulphur bomb, the picture kept on and was not immediately shut off; the performance continued and the full lights did not go up for seven, eight or perhaps ten minutes; that the ushers were not seen in the aisles; no one appeared upon the stage to warn the people that there was no danger, and there was a rush to the left of the house facing the stage, toward an exit which was near the front, not immediately opened.

Now what all these omissions had to do with the man who lost his head and jumped over the seats onto the plaintiff does not appear; neither does it appear that if any or all these things, complained of by the plaintiff, had been done or complied with, that he would have kept still. In other words, there is absolutely no connection between the failure of the ushers to be in the aisle, the absence of any warning from the stage, the failure to put on the lights immediately or the opening of the door on the left with the action of this spectator who, in

a few seconds after the flash, jumped over the seats on to the plaintiff, making for the front door. To say that these things had anything to do with his action is the wildest guess. The impression made upon the trial judge comes out in his opening charge to the jury: "The case is interesting because it involves a question of mob psychology, the behavior of man in the mass or in the herd, the behavior of man when fear and cowardice and excitement enter his soul." The plaintiff was hurt by just such a man. Nothing the theatre proprietors could have done, so far as the evidence shows, would have prevented this panic-stricken man from jumping on the plaintiff.

The judge further stated in his charge to the jury that before the defendant could be held liable, "there must be the additional factor, that the time element entered in, and that this man's panic was due not only to the explosion, but also in some measure to the closed exits, to failure to put on the lights, to failure to issue warning cries and to tell the audience to be calm and to be seated." There is no evidence to show, or from which the jury could infer, that "this man's panic" was due to anything else than the explosion. Besides the failure immediately to turn on the lights or to send ushers through the aisles or to make an announcement from the platform or immediately to open an exit on the left would not in and of themselves make the defendant liable. These were all matters of judgment to be exercised in view of the emergency and the possible seriousness or extent of the fire or supposed fire.

The defendant was not obliged to exercise the best judgment, and would not be liable for a wrong choice of action if called upon to act quickly in the face of peril. Even if the plaintiff were injured by reason of the failure to do any or all of these things, the jury would still have to determine whether the defendant, under all the circumstances, had used reasonable care. Perhaps the quickest way to quiet a panic would be to keep the

picture or performance going. This request was made for a charge — " I ask your Honor to charge the jury that there is no proof in the case that from the time of the explosion to the time the unidentified man placed his hand on the shoulder of the plaintiff, sufficient time elapsed to permit the defendant to act in the matter." It was error to refuse this request as there was no such proof, and the complaint should have been dismissed.

For the reasons here stated, the judgments of the lower courts should be reversed and the complaint dismissed, with costs in all courts.

POUND, Ch. J., O'BRIEN, HUBBS, CROUCH and LOUGH-RAN, JJ., concur; LEHMAN, J., not sitting.

Judgments reversed, etc.